UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

TERRY LEE, et al., )
)
       Plaintiffs, )
)
v. ) No. 3:99-CV-459
) (Guyton)
TENNESSEE VALLEY AUTHORITY, )
)
       Defendant. )

**MEMORANDUM OPINION**

**I.**     **Introduction**

This is an action for unpaid overtime compensation. The plaintiffs, all current or former employees of the defendant Tennessee Valley Authority ("TVA" or "TVA Nuclear"), claim that TVA's June, 1996 elimination of overtime pay for its management employees violates Section 7 of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 207 (2000). The subject matter of the Court is not in dispute. [Doc. 2].

The parties have consented to magistrate judge jurisdiction, and specifically, the undersigned, for all proceedings, including entry of judgment in accordance with 28 U.S.C. § 636(c). [Doc. 46].

This matter is presently before the Court on the defendant's motion for summary judgment with respect to the claims of three of the "non-overlapping" plaintiffs[1] in this case – Tony Jones, Jerry McCullough, and Bobby Shadrick. [Doc. 58]. After carefully considering the entire record, the Court concludes that summary judgment in favor of TVA is not appropriate as to the claims of plaintiffs Jones, McCullough, and Shadrick. Therefore, for the reasons set forth herein, the Court will **DENY** the defendant's Motion for Summary Judgment Regarding Claims of Three Non-Overlapping Plaintiffs [Doc. 58].

II.     **Relevant Facts**

As required by Rule 56 of the Federal Rules of Civil Procedure, the Court will recite and consider the relevant facts in the light most favorable to the plaintiffs. In doing so, the Court relies upon the pleadings and other matters on file, including the Declaration of Ronald H. Rogers; excerpts of the depositions of the three plaintiffs and exhibits filed therewith; and excerpts of the depositions of Elvis Hollins, Gilbert Little, and Ronald H. Rogers and exhibits filed therewith.

Prior to June, 1996, TVA Nuclear paid overtime pay to its managers beneath the senior management level. In June, 1996, TVA Nuclear changed its overtime policy and generally stopped paying overtime to all of its management employees. [Answer, Doc. 2]. The plaintiffs, including plaintiffs Jones, McCullough, and Shadrick, filed suit in 1999, claiming that they are entitled to overtime pay under the FLSA despite the change in TVA's policy. [Complaint, Doc. 1].

---

[1] This case originally involved 127 plaintiffs. Of those, 52 have been dismissed [Docs. 23, 57] and 68 others ("overlapping plaintiffs") have claims that overlap with claims at issue in Beene v. TVA, 3:99-cv-350, which is pending on appeal to the Sixth Circuit. The parties agree that Beene will serve as the framework for disposing of the claims of the overlapping plaintiffs. Only the claims of the seven "non-overlapping" plaintiffs remain in this case.

2

### A. Tony Jones

Plaintiff Tony Jones held the position of Operations Outage Specialist in the Browns Ferry Nuclear Plant's ("Browns Ferry") Outage Management/Site Scheduling Department ("Outage Scheduling") from March 16, 1998, until he retired in December, 2002. [Deposition of Tony Jones ("Jones Dep.") at 10, Exs. 1]. Jones does not seek any overtime compensation prior to March 16, 1998. [Jones Dep. at 10-11]. Prior to his retirement, Jones' annual salary was approximately $92,000. [Jones Dep. at 28].

Browns Ferry is a three-unit plant which currently operates two boiling water nuclear reactors. [Declaration of Ronald H. Rogers ("Rogers Decl.") at ¶ 2]. Unit 1 is currently in recovery from an extended shut down. [Id.]. Approximately every 24 months, each of the two currently operating units at Browns Ferry must be shut down for refueling and any necessary repairs and refurbishments. These shut downs are called outages. [Id.]. Because Browns Ferry has two operating units, these outages occur on the average of every twelve months. [Id.]. Every day that one of the units is shut down costs TVA approximately $400,000 in replacement electricity costs. [Deposition of Elvis Hollins ("Hollins Dep.") at 51-52]. Over the past decade, Browns Ferry has been able to reduce the average time for a refueling outage from two to three months to three to four weeks. [Rogers Decl. at ¶ 2].

During a refueling outage, the reactor unit is refueled so that the plant can sustain a certain power level, usually one hundred percent power, for some period of time after the outage. [Hollins Dep. at 38]. While the reactor unit is offline for a refueling outage, TVA tries to correct any deficiencies in the unit equipment that cannot be worked on while the unit is operating. [Id.].

3

Thus, the primary focus of the Outage Scheduling group is the planning and executing of a schedule for the outage period for the correction of deficiencies, the performance of surveillances and other testing, and the performance of preventative maintenance activities on components that cannot be worked on while the unit is in operation. [Hollins Dep. at 38-39].

Jones was assigned and reported to the Unit 3 Outage Manager, and he also received direction from the Senior Outage Manager, Elvis Hollins. [Hollins Dep. Ex. 2; Hollins Dep. at 18, Ex. 4]. According to Hollins, Jones "was assigned specific areas of responsibility that he was expected to investigate, prepare for, and then ensure that the organizations that he needed involved in preparations for those particular areas of responsibility had done their required function, and that that area was ready for the refueling outage." [Id. at 40]. Hollins further explained that these duties required Jones to make decisions, recommendation, and suggestions. [Hollins Dep. at 41-44]. For example, Jones gathered, compiled, and reviewed information on problems encountered during the outage; categorized and prioritized such information as lessons learned; and recommended which of these lessons learned Outage Scheduling and plant management should focus on in order to avoid such problems in the future. [Id. at 40-41]. He recommended how to schedule activities, including determining the proper sequence of activities to help accomplish the timely completion of the outage. [Id. at 43]. Hollins testified that Jones' recommendations were accepted most of the time, and that he could not "recall any issues along those lines with anyone saying they ever had any problem with accepting his recommendations." [Id. at 44].

Jones' background was in Operations. [Hollins Dep. at 9]. Also, at one time, Jones had held a Senior Reactor Operator ("SRO") license to operate the reactor unit. [Id. at 37]. As an

4

Outage Specialist, Jones made recommendations based on this previous experience and expertise in the field of Operations. [Id. at 13, 27]. As Hollins testified:

> A. Well, he would be doing things like providing his expertise to give guidance to our schedulers on how to schedule that activity. Specifically, where can it be scheduled at? What is its predecessor? What is [sic] its successors? What activities would it conflict with?
>
> So, that's the kind of things that he would be helping with during the non-outage period getting ready for an outage in that particular area.
>
> Q. When he provides this guidance, is he saying – is he making recommendations as to what sequence to do different surveillance instructions in?
>
> A. That's correct. He's making recommendations based on his previous experience.

[Hollis Dep. at 13]. With respect to scheduling, Hollins further testified as follows:

> A. [O]ther organizations may have called him and would have called him as we were getting prepared for an outage to ask him questions about how their activities fit in a schedule, if they thought there might be some conflicts.
>
> Again, he was continually reviewing the schedule from his perspective to see if he could identify any conflicts. So, he would be analyzing those conflicts or analyzing the schedule. If he found some conflicts, making the recommendation – recommending changes or other ways of avoiding those conflicts.
>
> So, other organizations would call the specialist, like they would the Outage Manager from time to time, to get that kind of advice or give them some information about some activity they were preparing for to get them to look into it in more detail and provide them some type of recommendation.
>
> Q. Is he a source of technical expertise or is he evaluating courses of conduct?
>
> A. No. It was more along the lines of technical expertise.

[Id. at 15-16].

5

Whether Jones made a decision as to which course of action to follow depended on the level of the problem. Problems that could have more of a significant impact to the outage would have been taken to the Outage Manager. [Id. at 29]. However, Jones was expected to deal with less significant issues himself. As Hollis explained, "[w]e expected these guys, especially as they were on shift during the outage, to make decisions they felt comfortable with. Then make the recommendations and move on." [Id. at 30]. With respect to changes in the schedule, Jones would only make recommendations; he could not direct a schedule change on a significant issue, nor was he involved in the actual changing of the schedules. [Id. at 44; Jones Dep. at 19].

Hollins testified the Outage Specialist position is "critical" at all three TVA nuclear sites, including Browns Ferry, to the success of the refueling outage. [Hollins Dep. at 53]. Hollins further testified that Jones' recommendations regarding the planning and execution of the Outage schedule were "significant" because "that is a major piece of the refueling outage schedule." [Hollins Dep. at 50]. If outage activities are not scheduled properly, the refueling outage period could be extended, resulting in the loss of several hundred thousand dollars per day. [Hollins Dep. at 51].

**B.     Bobby Shadrick**

Bobby Ronald Shadrick held the position of Maintenance Project Coordinator (which was renamed Senior Technical Specialist in a TVA standardization in July, 2000) in the Maintenance and Modifications Organization ("Maintenance Department") at Browns Ferry during the relevant time period beginning in August, 1997 until his retirement in November, 2001. [Deposition of Bobby Shadrick ("Shadrick Dep.") at 7-8; Deposition of Ronald H. Rogers ("Rogers

Dep.") at 132-33]. Prior to his retirement, Shadrick had an annual salary between $76,000 to $78,000. [Shadrick Dep. at 7].

The Maintenance Department is responsible for any corrective work necessary to return the plant equipment and systems to their original and intended operating condition. [Rogers Dep. at 125]. Based on the priorities set by Plant Operations, the Maintenance Department repairs any equipment, systems, and/or components that have failed or degraded. [Id.]. The Maintenance Department is staffed 24 hours a day to ensure that all of the plant equipment is available in good condition, to ensure the health and safety of the public, and to ensure the safe generation of affordable electric power. [Id. at 126]. As Ronald Rogers testified, Browns Ferry "wouldn't run long without [the] Maintenance Department." [Id.].

Shadrick testified that the Job Description of his position [Shadrick Dep. Ex. 1] was a "pretty broad" description on the tasks of his job, and it was "definitely not what [he] performed." [Shadrick Dep. at 9]. Shadrick testified that as part of his day-to-day activities, he reviewed particular experience reviews, corrective action plans, and regulation changes and put that information down in a report that went to his supervisor "for his review and for his actions to respond." [Id. at 9-10]. Shadrick also reviewed operating, emergency, and maintenance procedures and "tried to match [them] up with the plant design programs requirements." [Id. at 10]. He provided that information to his supervisor and pointed out potential weaknesses. [Id. at 10-11]. Shadrick testified that while he would occasionally recommend that something needed to be done, he did not recommend a specific course of action. [Id. at 11]. Shadrick specifically testified as follows:

> Q. Why didn't you recommend specific action?
>
> A. It wasn't my place to recommend those actions, other than providing the possibilities of proposed actions. Recommendations. Mine were recommendations. Not for precise action.
>
> Q. And did you recommend proposed action then?
>
> \* \* \*
>
> A. Sometimes, yes.

[Id. at 12].

Shadrick was involved in the Foreign Materials Exclusion program. Shadrick testified that his role was to "more or less monitor[] to see if we were actually performing that function or not." [Id. at 18]. If a function was not being performed, Shadrick would prepare a Problem Evaluation Report ("PER") to be reviewed and evaluated by upper management to "see what kind of actions they wanted to take." [Id. at 19]. Shadrick described his role as "acting as a scribe to record the information and to provide the final reports." [Id. at 21]. Shadrick would also monitor other goals set by upper management, including personnel safety, injury, radiation exposure, sick leave, and work order backlog and summarize his observations in a report or see if it was compatible with other records. [Id. at 22-26]. Shadrick stated that his role was as "an informational source . . . [to] provide information to the management," but that he did not advise management on a particular course of action to take. [Id. at 36-37].

Ronald Rogers, the former Maintenance and Modifications Manager, agreed that "a lot" of Shadrick's job duties involved the compilation of data. [Rogers Dep. at 136]. Rogers testified, however, that Shadrick would put the information "in a format that it would draw a conclusion, and he would typically draw the conclusion and make a recommendation for where we need to go with that" to management. [Id. at 136-37]. Rogers noted that Shadrick "was pretty much

8

a one-man show" and performed his duties independently, without much direction or guidance from management. [Id. at 137-38, 144]. Rogers testified further that Shadrick "would make the initial [recommendation] . . . subject to comments and change before we issued it as a department, but he made the initial recommendation, and he had privy to all the data that we didn't necessarily have. So, in general his actions were acted upon and [so were] his recommendations." [Id. at 160-61]. Shadrick's work, however, was always reviewed by upper management to determine whether they agreed with his conclusions and recommendations. [Id. at 138, 144].

### C. Jerry McCullough

Plaintiff Jerry McCullough held two positions – Operations Specialist and Shift Support Supervisor – during the relevant time period starting in August, 1997 until his retirement in December, 2002. [Deposition of Jerry McCullough ("McCullough Dep.") at 7-14; Exs. 1, 3]. He worked as an Operations Specialist from January 6, 1997 until March 14, 1999, and thereafter worked as a Shift Support Supervisor until his retirement. [McCullough Dep. at 9]. At the time of his retirement, McCullough's annual salary exceeded $70,000. [McCullough Dep. at 76].

McCullough formerly had a SRO license but lost it when he quit TVA in 1981 and the license expired. [McCullough Dep. at 99]. Thus, he had to complete the entire training program again in order to re-qualify for his SRO license. [Id.]. TVA placed McCullough in the Operations Specialist position in January, 1997, so that he could obtain the necessary training and experience to regain his SRO license. [Id. at 11, 42-43, 99]. TVA, however, removed McCullough from the training program due to poor performance, and he therefore did not complete the SRO training. [Id. at 99-100].

9

After he was removed from the SRO training program, McCullough received a temporary rotational assignment in the Outage Department for approximately four weeks. [McCullough Dep. at 8-9]. TVA does not contest McCullough's claim that he is entitled to overtime compensation for any overtime hours he may have worked during this four-week assignment. [Doc. 59].

After his temporary assignment in the Outage Department, McCullough received a temporary rotational assignment to the Materials Department from October, 1998 to March, 1999. [McCullough Dep. at 8-9, 13-14]. While in the Materials Department, McCullough worked as a Materials Analyst, examining and evaluating procurement requests. [Id. at 16-17]. He prepared reports for his manager about how to get equipment cheaper, and he testified that he found "lots of ways" to cut costs. [Id. at 18, 44]. McCullough also prepared presentations, which would contain evaluations of the possible benefits of the material or equipment that management was contemplating purchasing, for his supervisor to present to the Materials Procurement Review Board. [Id. at 17-18]. With respect to these proposed presentations, McCullough testified that his supervisor would "either use it or present it, or change it or do whatever he wanted to with it. Most of the time, he ignored it." [Id. at 18].

McCullough became a Shift Support Supervisor in March, 1999. [McCullough at 9]. McCullough testified that the position was created to remove clerical duties from the Unit Supervisor. [Id. at 79]. McCullough testified that he performed mostly clerical duties in this position; he testified that he ran errands and answered the telephone. [Id. at 9, 79-80]. His duties also included reviewing clearances and schedules and auditing paperwork. [Id. at 20]. He would report schedule conflicts, work scopes, and safety conflicts to management "for them to resolve."

10

[Id. at 23]. When he reported a conflict in the schedule to the Unit Supervisor, McCullough testified that his report would include a suggested or recommended resolution of the conflict. [Id. at 49-50]. McCullough testified that his schedule analysis was important because "if [the equipment] wasn't removed from service, . . .if it wasn't taken out of service or put back into service, then it [would] cause[] something else to be delayed." [Id. at 25]. McCullough, however, did not make any decisions regarding schedule changes; he merely reported schedule problems to his supervisor. [Id.].

Gilbert Little, the Unit 1 Operations Manager, testified that the Shift Support Supervisor position "is a work controlled position for authorizing, approving and coordinating clearance activities." [Deposition of Gilbert Little ("Little Dep.") at 69]. If the position did not exist, management would not "have a way to authorize work short of sending everybody to the main control room to get authorization to go to work." [Id.]

### III.  The Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of establishing that there is no genuine issue of material fact lies upon the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

In considering a motion for summary judgment, the Court must take all of the evidence submitted by the non-moving party as true, and must draw all reasonable inference in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505,

11

2513, 91 L. Ed. 2d 202 (1986). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. Id. at 248, 106 S. Ct. at 2510. The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. Id.

Once the moving party presents evidence sufficient to carry its burden under Rule 56, the non-moving party may not rest upon its pleadings, but must affirmatively set forth, by affidavits or otherwise, "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). An entry of summary judgment is mandated if, "after adequate time for discovery and upon motion, [the non-moving party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552. In reviewing the evidence, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52, 106 S. Ct. at 2512.

**IV.** **Analysis and Ruling**

Section 7(a) of the FLSA requires an employer to pay an employee overtime for the hours worked in excess of 40 hours per week. 29 U.S.C. § 207(a)(1) (2000). However, employees who are "employed in a bona fide executive, administrative, or professional capacity" are exempted from this overtime compensation requirement. 29 U.S.C. § 213(a)(1) (2000). This exemption is to be "narrowly construed" against employers and is "limited to those [circumstances] plainly and unmistakably within their terms and spirit." Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80

12

S. Ct. 453, 4 L. Ed. 2d 393 (1960); Douglas v. Argo-Tech Corp., 113 F.3d 67, 70 (6th Cir. 1997). The employer bears the burden of proving that the subject employee is exempted from the FLSA. Douglas, 113 F.3d at 70; Michigan Ass'n of Governmental Employees v. Michigan Dep't of Corr., 992 F.2d 82, 83 (6th Cir. 1993).

The FLSA does not explicitly define the terms "bona fide executive, administrative or professional capacity." Rather, Congress delegated that task to the Secretary of Labor, who has promulgated regulations defining the terms. See 29 U.S.C. § 213(a)(1); 29 C.F.R. §§ 541.2 *et seq*. To determine whether an employee is exempt from the overtime compensation requirements of the FLSA, the regulations provide for a "long test" or a "short test." 29 C.F.R. § 541.2. Because Jones, McCullough, and Shadrick were paid on a salary basis in excess of $250 per week, the parties agree that the "short test" is applicable to determine these plaintiffs' exempt status.[2]

Pursuant to the "short test," an employee is exempt from the FLSA's overtime compensation requirement if: (1) the employee is paid on a salary basis; (2) the employee's "primary duty consists of either the performance of office or nonmanual work directly related to management policies or general business operations of the employer or the employer's customers"; and (3) the employee's primary duty "includes work requiring the exercise of discretion and independent judgment." 29 C.F.R. §§ 541.2 and 541.214(a) (2004).

Under the first prong of the short test, TVA must show that the plaintiffs were paid on a salary basis. 29 C.F.R. § 541.2(e)(2). As indicated previously, it is undisputed that plaintiffs

---

[2]Recently, the FLSA regulations were amended. See 69 Fed. Reg. 22,122 (Apr. 23, 2004). However, the parties agree that these amendments do not apply to this case. Accordingly, all references herein shall be to the unamended regulations.

13

Jones, McCullough, and Shadrick were paid a salary. Accordingly, the first element of the short test is satisfied. Under the second prong of the short test, TVA must show that the plaintiffs' primary duties consisted of (1) office or nonmanual work, (2) directly related to his employer's management policies or general business operations, (3) that is of "substantial importance" to the management or operation of TVA's business. 29 C.F.R. §§ 541.2(a)(1), 541.205(a) (2004). The plaintiffs do not contest that they performed office or nonmanual work; however, they argue that their work was not directly related to management policies or general business operations, and that it was not of "substantial importance."

Work that is "directly related to management policies or general business operations" must involve "the administrative operations of a business as distinguished from 'production.'" 29 C.F.R. § 541.205(a) (2004). "Administrative operations" include "the work performed by so-called white-collar employees engaged in 'servicing' a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." 29 C.F.R. § 541.205(b) (2004). "Production" work, on the other hand, involving employees generating "the very product or service that the employer's business offers to the public." Renfro v. Indiana Mich. Power Co., 370 F.3d 512, 517 (6th Cir. 2004), reh'g en banc denied June 2, 2004. Therefore, when an employee is engaged in work that is "ancillary to an employer's principal production activity," the employee is considered to be administrative. Id. The administrative-production dichotomy, however, "does not fit all cases" and "is only useful to the extent that is a helpful analogy in the case at hand, that is, to the extent it elucidates the phrase 'work directly related to the management policies or general business operations.'" Schaefer v. Indiana Mich. Power Co., 358 F.3d 394, 402-03 (6th Cir. 2004). In determining whether the administrative

14

exemption applies, the Court must focus on an employee's actual daily activities, as opposed to generalized job descriptions and the characterization of these duties in the employee's resume. <u>Ale v. Tennessee Valley Auth.</u>, 269 F.3d 680, 688 (6th Cir. 2001).

Pursuant to the Department of Labor regulations, an employee's work is of "substantial importance" if the "work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business." 29 C.F.R. § 541.205(c). Such work does not include "routine clerical duties" or performing activities which, if not properly done, would cause a loss to the employer. 29 C.F.R. § 205(c)(2).

The third prong of the short test requires TVA to show that the plaintiffs' primary duty requires "the exercise of discretion and independent judgment." 29 C.F.R. §§ 541.2(e)(2) and 541.214(a). The regulations define "discretion and independent judgment" as "the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a). Implied in this definition is "that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." <u>Id.</u> The regulations make a distinction between such employees and the "employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow . . . ." 29 C.F.R. § 541.207(c)(1).

Upon carefully reviewing the record, and in particular, the depositions of the plaintiffs and their respective supervisors, the Court finds that there are genuine issues of material fact regarding whether the plaintiffs' primary duties "directly related to management policies or general business operations"; whether their duties were of "substantial importance"; and whether

15

the plaintiffs respectively exercised "discretion and independent judgment" within the meaning of the regulations.

There is evidence in the record which creates a genuine issue of fact as to whether these plaintiffs qualify for the administrative exemption. Elvis Hollins testified that Jones' actual day-to-day activities as an Outage Specialist involved the use of his extensive technical expertise regarding the plant equipment, as opposed to the evaluation of various courses of conduct. "An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow . . . is not exercising discretion and independent judgment within the meaning of § 514.2." 29 C.F.R. § 541.207(c)(1); see also Schaefer, 358 F.3d at 405 (finding environmental specialist used extensive knowledge and application of skill in performing his duties, as opposed to the exercise of discretion and independent judgment). Furthermore, Hollins testified that while Jones had authority to make some decisions on less significant matters, he did not do so with respect to more significant issues.

With respect to Shadrick, the plaintiffs have introduced evidence that his primary duty was the compilation of data, which he then assembled in a comprehensible form and presented to his supervisor. While he would occasionally make recommendations as to a particular course of action, there is evidence in the record to support a finding that he did not have the authority to make decisions of any substantial importance.

Finally, with respect to McCullough, it does not appear that he had authority to make significant purchases for TVA while he was assigned to the Materials Department. Further, it was McCullough's testimony that his duties as Shift Support Supervisor were primarily clerical, and that while he reported schedule conflicts to his supervisor and occasionally made recommendations, he

16

did not make any decisions regarding schedule changes. Based upon the material factual disputes evident in the record, the Court finds that an award of summary judgment would be inappropriate.

V.        **Conclusion**

The Court finds that there are genuine issues of material fact which preclude the grant of summary judgment as to the claims of plaintiffs Jones, McCullough, and Shadrick. Accordingly, for the reasons set forth above, and based upon the entire record in this case, the defendant's Motion for Summary Judgment Regarding Claims of Three Non-Overlapping Plaintiffs [Doc. 58] will be **DENIED**.

**ORDER TO FOLLOW.**

**ENTER:**

        s/ H. Bruce Guyton        
United States Magistrate Judge